IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

JANICE OAKLEY JOHNSON;
ALFONZO JOHNSON;
and FRED OAKLEY                                                          PLAINTIFFS

v.                                          Case No. 1:24-cv-01019

ASTIK KRUPA, LLC, *d/b/a*
DAYS INN FORDYCE.                                                        DEFENDANT

### MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed by Defendant Astik Krupa, LLC

("Defendant").  (ECF No. 24).  Plaintiffs Janice Oakley Johnson, Alfonzo Johnson, and Fred

Oakley ("Plaintiffs") have responded.[1]  (ECF No. 29).  Defendant has filed a reply.  (ECF No. 33).

### I.      BACKGROUND

This is a race discrimination and tort of outrage action that arises from an incident that took

place at the Days Inn in Fordyce, Arkansas, on October 6, 2023.  Plaintiff Alfonzo Johnson ("Mr.

Johnson"), Plaintiff Janice Oakley Johnson ("Ms. Johnson"), and Mr. Patel, an employee at the

Days Inn, engaged in a verbal altercation that ended when Mr. Patel called the police.

Subsequently, Plaintiffs filed the instant action alleging that they were discriminated against based

on their race in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000a of the Civil Rights Act and

that Defendant's behavior towards Plaintiffs was so outrageous and extreme that it amounts to a

tort of outrage under Arkansas law.  (ECF No. 2, at 4-6).

The relevant events began in July of 2023, when Plaintiff Janice Oakley Johnson ("Ms.

---

[1] The parties note in their briefs that both parties have agreed to dismiss Plaintiff Fred Oakley pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  (ECF No. 25, at 22 n.9; No. 31, at 2 n.1).  A Joint Stipulation of Voluntary Dismissal was filed by Plaintiffs on October 17, 2025.  (ECF No. 35).  "Caselaw concerning stipulated dismissals under Rule 41(a)(1)(A)(ii) is clear that the entry of such a stipulation of dismissal is effective automatically and does not require judicial approval." *Gardiner v. A.H. Robins Co.*, 747 F.2d 1180, 1189 (8th Cir. 1984).

Johnson") searched for hotel rooms in Fordyce, Arkansas, to attend the Fordyce Club Reunion with her father, Fred Oakley, and husband, Mr. Johnson. (ECF No. 30, at 2). The Fordyce Club reunion is a fundraiser developed by club members, who are alumni of a segregated high school. (ECF No. 30, at 2). Ms. Johnson, Mr. Johnson, and all members of the Fordyce Club are African American. (ECF No. 30, at 1, 6). Rosie Snowden, president of the Fordyce Club, reserved a block of rooms at the Days Inn for the Fordyce Club members attending the reunion on October 6, 2023, through October 8, 2023. (ECF No. 30, at 5-6). The special event rate for an event room was $90 to $105 per night. (ECF No. 30, at 6). Guests were required to book an event room directly with the Days Inn to receive the discounted price. (ECF No. 30, at 7).

The parties dispute how Ms. Johnson found and booked her rooms at the Days Inn. According to Plaintiffs' version of the facts, to book her reservation Ms. Johnson googled the number for the Days Inn and called the number she found. (ECF No. 30, at 2). Ms. Johnson spoke with a woman she believed to be Caucasian and an old classmate to reserve her rooms. Ms. Johnson asked for two rooms next to each other for October 6 through October 7, 2023. (ECF No. 30, at 5). Ms. Johnson believed that the price per room per night was $69, based on information she found on the Days Inn website. (ECF No. 30, at 5). In sum, Plaintiffs argue that Ms. Johnson booked her rooms over the phone directly with Days Inn for October 6 through October 7, 2023, at a price of $69 per room per night.

Defendant claims a different version of the facts. According to Defendant, the number that Ms. Johnson called to reserve her rooms belonged to a third-party travel agency. (ECF No. 30, at 3). As such, Defendant claims that Ms. Johnson never directly spoke with Days Inn when reserving her rooms. Instead, she reserved her rooms through the travel agency.[2]   Then, the travel agency

---

[2] Ms. Johnson testified that she was "not sure" that the number she called connected her directly to Days Inn "[b]ecause a Caucasian lady answered." (ECF No. 24-1, at 26).

used "SynXis," a web-based reservation management system that allows travel agencies to input reservation information on behalf of hotel customers, to enter the details of Ms. Johnson's reservation into Days Inn's SynXis page.  (ECF No. 30, at 4).  The information entered into SynXis shows a reservation of two rooms for Ms. Johnson arriving on October 5, 2023, and departing on October 8, 2023.  (ECF No. 30, at 4). It also shows that Plaintiffs agreed to pay $112.50 per night for the first room and $125.00 per night for the second room.  (ECF No. 30, at 4).  Thus, Plaintiffs and Defendant disagree over how Ms. Johnson made the reservations, the price of the rooms, and the dates of the intended stay.

Plaintiffs, under the impression that their reservation at Days Inn did not begin until October 6, 2023, spent the night of October 5, 2023, at Ms. Johnson's niece's house.  (ECF No. 30, at 7).  Because Plaintiffs did not check in on their scheduled arrival date of October 5, 2023, Defendant charged them for the night of October 5th.  Defendant performs a daily "night audit" in which its computer system automatically charges the credit card provided by the customer to secure the room.  (ECF No. 30, at 8).  Mr. Patel, who oversaw the night audit, believed Plaintiffs' failure to arrive on October 5th to be a mistake and directed the Days Inn staff not to cancel Plaintiffs' entire reservation.  (ECF No. 30, at 9).  On October 6, 2023, Plaintiffs drove to Fordyce, Arkansas, to check in to the Days Inn.  Early that morning, Mr. Oakley, whose credit card was used to make the reservation, received a fraud alert from his bank, alerting him to the $443.54 charge from Days Inn.  (ECF No. 30, at 10).

Mr. Patel was working the front desk when Plaintiffs arrived at the Days Inn.  Ms. Johnson asked about the charges made to Mr. Oakley's credit card and Mr. Patel agreed to refund the amount charged for the night of October 5, 2023.  (ECF No. 30, at 11).  Mr. Patel provided the registration documents to Plaintiffs, which showed the charges for three nights for the two reserved rooms.

Ms. Johnson complained that the registration documents were "not clear" and that she couldn't tell how much Days Inn was charging. Ms. Johnson told Mr. Patel that he needed to "either give [her] a clean invoice, circle it, initial it, [or] do something." (ECF No. 30, at 13). Mr. Patel then wrote the refund amount, the amount for the two rooms, and the total amount on the registration document. (ECF No. 30, at 13-14). Ms. Johnson also asked Mr. Patel to move her two rooms next to each other to accommodate her elderly father, Mr. Oakley. Mr. Patel agreed to change the rooms so both would be on the bottom floor. Ms. Johnson then asked Mr. Patel to provide her with a "clean invoice" or receipt. Mr. Patel told Ms. Johnson that she would receive a clean invoice that detailed the charges upon checkout. (ECF No. 30, at 15).

The parties disagree on what happened next. According to Defendant, for 25 to 30 minutes Ms. Johnson repeatedly asked Mr. Patel for a clean invoice. Ms. Johnson also told Mr. Patel that the room rates were incorrect, that Plaintiffs would not stay at the Days Inn, and that Plaintiffs wanted a refund. (ECF No. 30, at 16). Plaintiffs also complained about the room locations because they wanted their rooms to be side by side. Plaintiffs continued to argue with Mr. Patel, and Mr. Johnson told Mr. Patel, "you will learn." (ECF No. 30, at 17). Mr. Johnson raised his voice, lost his temper, and "knock[ed] the counter door." (ECF No. 26, at 13). Mr. Patel then told Plaintiffs to leave, or he would call the police. When Plaintiffs refused to leave, Mr. Patel called the police. (ECF No. 30, at 17).

According to Plaintiffs, when Ms. Johnson requested a clean receipt, Mr. Patel "went ballistic," yelling that he did not have to do anything for them and that they "need to get out" or he was going to call the police. (ECF No. 31, at 6). Plaintiffs claim that Mr. Patel also called them

4

the "n-word" and stated that Mr. Johnson was a drunk.[3]  (ECF No. 31, at 6-7).  When Ms. Johnson

requested a refund, Mr. Patel refused.  Mr. Patel then called the police.

When the police arrived, Mr. Patel told one officer that the parties had a dispute over their

rooms, charges, and the invoice.  Mr. Patel also told the officer that he "just want[ed] to make

[Plaintiffs] leave" and that he was going to refund Plaintiff's money.[4]  (ECF No. 30, at 18).  The

other officer remained outside and spoke with Plaintiffs.  Mr. Johnson told the officer that the

parties "got into a little heated argument" about the price of the hotel rooms, dates, and invoice.

(ECF No. 30, at 19; ECF No. 24-7).  Plaintiffs did not tell the officer that Mr. Patel used racial

slurs, called Mr. Johnson a "drunk," or told them to leave because of their race.  (ECF No. 30, at

19; ECF No. 24-7; ECF No. 24-8).  Plaintiffs eventually left Days Inn and booked rooms at a

nearby hotel.  (ECF No. 31, at 7).

After the incident, Plaintiffs spoke with Ms. Snowden about their experience with the Days

Inn.  Plaintiffs told Ms. Snowden that they were asked to leave because Mr. Patel said they were

being disruptive.  (ECF No. 24-11, at 2).  Plaintiffs did not tell Ms. Snowden that Mr. Patel used

the "n-word" or told them to leave because of their race.  (ECF No. 24-11, at 2).  Ms. Snowden

stated that she did not receive any complaints about the Days Inn from any other Fordyce Club

members staying there or that any other Fordyce Club member was told to leave.[5]  (ECF No. 24-

11, at 2-3).

On March 15, 2024, Plaintiffs filed their Complaint in this case.  (ECF No. 2).  In the

---

[3] Specifically, Mr. Johnson testifies that Mr. Patel spoke a foreign language with his wife, Ms. Patel, who was also present.  While Mr. Patel was speaking the foreign language, Mr. Johnson heard Mr. Patel say the "n-word."  (ECF No. 24-2, at 29-30).  Mr. Patel denies using the "n-word."  (ECF No. 24-3, at 59).

[4] Plaintiffs deny that Mr. Patel spoke with the officer, citing to his deposition where he testified "No. I didn't have any talk with the officer."  (ECF No. 24-3, at 38).  Defendant cites to the officer's Body Camera Video, which shows Mr. Patel speaking with the officer.  (ECF No. 24, at 14; 24-8).

[5] The Court notes that Plaintiffs admits these facts, stating that "[t]his was not the place or time to deal with the matter. Also, what if anything could Snowden have done."  (ECF No. 30, at 20).

Complaint, Plaintiffs argue that Defendant: (1) discriminated against them based on their race in violation of 42 U.S.C. § 1981; (2) discriminated against them based on their race in violation of 42 U.S.C. § 2000a; and (3) subjected them to extreme and outrageous conduct that amounts to the tort of outrage.  (ECF No. 2).

On September 9, 2025, Defendant filed the instant Motion for Summary Judgment.  (ECF No. 24).  Defendant argues that Plaintiffs cannot establish that race was the "but-for" cause of Mr. Patel's request for Plaintiffs to leave Days Inn or that the parties entered a contract as required by § 1981.  (ECF No. 25, at 7, 10).  Defendant also argues that Plaintiffs cannot recover under § 2000a because they do not seek injunctive relief, and even if they did, they failed to establish the requisite standing to seek injunctive relief.  (ECF No. 25, at 12).  Defendant further argues that Plaintiffs cannot show that they were treated less favorably than similarly situated individuals who are not African American.  (ECF No. 25, at 14).  Defendant finally argues that Plaintiffs cannot establish the elements of the tort of outrage.  (ECF No. 25, at 15).

## II.    STANDARD OF REVIEW

The standard for summary judgment is well established.  When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).  This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material only when its resolution affects the outcome of the case.  *Id*. at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either

party. *Id*. at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving part's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007).

Plaintiffs argue that the Eighth Circuit cautions against using summary judgment in discrimination cases. (ECF No. 31, at 10); *see Torgerson v. City of Rochester*, 605 F.3d 584, 593 (8th Cir. 2010), *abrogated by Torgerson v. City of Rochester*, 634 F.3d 1031, 1043 (8th Cir. 2011). The Eighth Circuit previously indicated in several panel decisions that summary judgment is "disfavored" and should be used "sparingly" in discrimination cases because they are inherently fact based. *See Torgerson*, 643 F.3d at 1058 (collecting cases). However, it has since been made clear that those decisions have been abrogated and should not be followed because "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Id.* at 1043. Accordingly, the Court applies the same summary judgment standard to discrimination cases

as it does to all others.

### III.    DISCUSSION

The Court faces three general issues in the instant motion: (1) whether Defendant is entitled to summary judgment as to Plaintiffs' race discrimination claim under 42 U.S.C. § 1981; (2) whether Defendant is entitled to summary judgment as to Plaintiffs' race discrimination claim under 42 U.S.C. § 2000a; and (3) whether Defendant is entitled to summary judgment as to Plaintiffs' tort of outrage claim.

### A.  Section 1981 Claim

Plaintiffs claim that Defendant discriminated against them in violation of 42 U.S.C. § 1981. The § 1981 Contracts Clause guarantees that all persons in the United States "shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Section 1981(b) defines the term "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

To establish a prima facie case of racial discrimination under §1981, a plaintiff must show "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with an activity by the defendant." *Johnson v. Schulte Hosp. Grp., Inc.*, 66 F.4th 1110, 1118 (8th Cir. 2023).  To prevail on a Section 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).

There is no dispute that Plaintiffs are members of a protected class.  Defendant argues that Plaintiffs fail to establish element three, engagement in a protected activity, because Plaintiffs did

not enter into a contract with Defendant.  Defendant also argues that Plaintiffs do not satisfy their burden of proving that race was the but-for cause of their injuries.  The Court will take each argument in turn.

### 1.  Engagement in a Protected Activity

To satisfy the third element, engagement in a protected activity, in a §1981 claim, the plaintiff must "identify an impaired 'contractual relationship' under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 480 (2006) ("[A] plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'").

Defendant argues that it is entitled to summary judgment because Plaintiffs and Defendant never formed a contract and, therefore, Plaintiffs cannot "identify an impaired 'contractual relationship' under which [they have] rights." *Id*.  Defendant contends that no contract was formed between the parties because there was no "meeting of the minds" of the parties as to the contract's material terms, including duration, price, and room location. (ECF No. 25, at 10).  Plaintiffs believed that they booked two adjacent rooms for the nights of October 6th and 7th for $69 per room per night.  Defendant thought Plaintiffs booked two rooms for the nights of October 5th through 7th at $112.50 per night for one room and $125.00 per night for the other.  Thus, Defendant argues, no contract was formed, and Plaintiffs have no rights under an existing contract on which to base their § 1981 discrimination claim.

Defendant's argument is misplaced because § 1981 protects prospective contractors, not just those who have formed an existing contract, as long as the plaintiff can identify an impaired "contractual *relationship*." *See Domino's Pizza*, 546 U.S. at 476.  The protection afforded by § 1981 "reaches 'beyond the four corners' of a contract into the contracting process." *Green v.*

*Dillard's Inc.*, 483 F.3d 533, 538 (8th Cir. 2007).   Defendant cites *Domino's Pizza, Inc. v. McDonald* to support its claim that the parties did not form a valid contract and thus had no contractual relationship.   (ECF No. 25, at 10); 546 U.S. 470 (2006).   In *Domino's Pizza*, the Supreme Court held that as shareholder and president of a business, McDonald could not assert a § 1981 claim against a company for breaching a contract with his business because the only contractual relationship McDonald identified was the one between his business and the other company.   546 U.S. at 477.   Since McDonald himself had no contract with the other company, the Supreme Court held he had no contractual relationship on which to base his § 1981 claim.   *Id.* at 477, 480 ("Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's.").

Thus, the question before the Court is whether the parties had a contractual relationship, not whether a contract had been formed.   The Supreme Court in *Domino's Pizza* instructed that "[s]uch contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made the contracts."   *Id.* at 476; *see Runyon v. McCrary*, 427 U.S. 160, 172 (1976) (holding liable defendants who prevented individuals seeking to enter into contractual relationships from doing so for racially motivated reasons).   "Section 1981 offers relief when racial discrimination *blocks the creation* of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."   *Domino's Pizza*, 546 U.S. at 476.

In the instant case, the parties had a "proposed contractual relationship." *See id.*   Plaintiffs arrived at the Days Inn believing that they had booked two rooms for two nights at a certain price. Defendant believed Plaintiffs booked those rooms for three nights at a different price.   The parties

10

then spent a considerable, though disputed, amount of time arguing about the terms of their contract under which Plaintiffs would have rights. The Court finds that this is at least a proposed contractual relationship.  Plaintiffs did more than what is required in the retail context, for example, where § 1981 plaintiffs must demonstrate that they "made some tangible attempt to contract," such as by showing an interest in specific items the retailer holds out for sale.  *Green v. Dillard's, Inc.*, 483 F.3d 533, 538 (8th Cir. 2007) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 752 (5th Cir. 2001)).  Here, Plaintiffs made more than a tangible attempt to contract.  They booked two rooms, provided a credit card, and showed up to the Days Inn to receive their room keys.  The term "make and enforce contracts" includes the process of "*making*" such prospective contracts, which is at least what the parties have done here.  *See* 42 U.S.C. § 1981(b).  Accordingly, the Court finds that Plaintiffs have sufficiently identified an impaired contractual relationship under which it has rights to satisfy element three of their § 1981 claim.

### 2.  Discriminatory Intent

To establish a prima facie case of racial discrimination under § 1981, a plaintiff must prove discriminatory intent.  *See Schulte Hosp. Grp.*, 66 F.4th at 1118.  A plaintiff may use direct or circumstantial evidence to prove discriminatory intent. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir. 1997).  Calling customers racial slurs is direct evidence of discriminatory intent. *See Green v. Dillard's, Inc.*, 483 F.3d 533, 540 (8th Cir. 2007).

Establishing a prima facie case of racial discrimination, however, is not the plaintiff's only burden.  In 2020, the Supreme Court clarified that a plaintiff asserting a § 1981 claim also bears the burden of "showing that race was a but-for cause of its injury."  *Comcast Corp*, 589 U.S. at 331, 333 (rejecting the Ninth Circuit's holding that a plaintiff need only plead facts plausibly showing that race played "some role" in the defendant's conduct).  To prevail on their § 1981

11

claim, Plaintiffs must also "prove that, but for race, [they] would not have suffered the loss of a legally protected right." *Id.* at 341.  Thus, Plaintiffs have the burden of showing that but for their race, Defendant would not have kicked them out of the Days Inn and called the police.

Defendant argues that Plaintiffs cannot show that their race was the but-for cause of Mr. Patel's request for them to leave the hotel.  Rather, Defendant argues that the reason Mr. Patel asked Plaintiffs to leave the Days Inn was because of the dispute between the parties due to a misunderstanding over the details of Plaintiffs' reservation.  (ECF No. 25, at 7).  Plaintiffs argue that they were simply requesting an explanation of their invoice when Mr. Patel began yelling at them, calling them racial slurs, and telling them to leave or he would call the police.  (ECF No. 31, at 13).  Plaintiffs do not dispute, however, the fact that the argument between the parties revolved, at least initially, around misunderstandings about their reservation.  (ECF No. 30, at 16).

The Court finds that while Plaintiffs may have shown discriminatory intent, they have not met their burden to prove that race was the but-for reason Mr. Patel kicked them out of the hotel and called the police.  Plaintiffs admit that the argument between the parties arose because of the charges to their account, prices, and invoice.  The Eighth Circuit has directed that disputes generally arising "out of mutual misunderstanding, misinterpretation and overreaction, . . . without more, . . . do not give rise to an inference of discrimination." *Johnson v. Legal Servs. of Ark., Inc.*, 813 F.2d 893, 896 (8th Cir. 1987).  Besides repeatedly asserting that Mr. Patel used racial slurs and told Plaintiffs to leave, Plaintiffs point to no evidence that demonstrates that Mr. Patel asked them to leave *because of* their race.[6]  *See Barton v. Thompson*, No. CIV.A.A. HAR-95-2154, 1996

---

[6] Plaintiffs suggest in their response that Defendant's failure to preserve the hotel lobby video of the event is evidence of some nefarious act or intent by Defendant that shows Defendant acted with discriminatory intent. (ECF No. 31, at 13).  Defendant testifies that the hotel lobby recordings are routinely kept for only a period of fifteen days. (ECF No. 24-3, at 13).  The Court first notes that Plaintiffs have not raised this argument prior to their response nor filed a formal motion for the Court's consideration pursuant to Local Rule 7.2. *See Hughes v. Reitnouer, Inc.*, No. 1:22-cv-01020, 2025 WL 2536218, at *2 (W.D. Ark. Sept. 3, 2025). Regardless, the Court finds no evidence that Defendant engaged in the spoliation of evidence.  Plaintiffs bear the burden of showing that Defendant intentionally destroyed the evidence

WL 827416, at *4 (D. Md. May 18, 1996) ("Even though [the defendant] may have used a racial slur during this incident, this alone is insufficient to show race was the *reason* [the defendant] asked [the plaintiff] to leave the premises, as required under section 1981.").

Rather, all evidence points to the fact that Mr. Patel asked Plaintiffs to leave because of their argument, not their race. Mr. Johnson, Ms. Johnson, and Mr. Patel all testify that the argument started and escalated around the request for the clean invoice, October 5th charge, and other reservation details. (ECF No. 24-1, at 66; No. 24-2, at 27; No. 24-3, at 74). Plaintiffs told the police officers and Ms. Snowden that they were asked to leave because of their argument. Further, Ms. Snowden testifies she did not receive any complaints about Days Inn from any other Fordyce Club members staying there, nor did she receive any information that other Fordyce Club members were told to leave. (ECF No. 24-11, at 2-3). Accordingly, the Court finds that Plaintiffs have not produced sufficient evidence to raise a material question of fact that race was the but-for cause of Defendant's conduct.

## B. Section 2000a Claim

Plaintiffs claim that they "were denied the full and equal enjoyment" of Defendant's hotel because of their race, in violation of 42 U.S.C. § 2000a(a). (ECF No. 2). Section 2000a prohibits discrimination in places of public accommodation. *See* 42 U.S.C. § 2000a(a). It provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without

---

with the intent to suppress the truth and that Plaintiffs were prejudiced by Defendant's actions. *See id.* at *3 (citing *Lincoln Composites, Inc. v. Firetrace USC, LLC*, 825 F.3d 453, 463 (8th Cir. 2016). Plaintiffs assert no evidence that Defendant allowed the recording to expire for an improper purpose. Instead, Plaintiffs argue that Defendant should have known to preserve the video because Mr. Patel testifies that the event was one of his worst experiences while operating the hotel. The Court finds that Plaintiffs fail to show any inference that Defendant intentionally spoliated the video evidence. Plaintiffs ask the Court to infer from Mr. Patel's testimony that Defendant should have expected future litigation. However, Defendant's "intentional destruction of the evidence with an intent to suppress the truth, *not its mere knowledge of the possibility of litigation*, is the key inquiry[.]" *See id.* at *4.

discrimination . . . on the ground of race . . . ." *Id.*   Section 2000a "authorizes only prospective relief, not money damages." *Abdull v. Lovaas Institute for Early Intervention Midwest*, 819 F.3d 430, 433 (8th Cir. 2016); *see* 42 U.S.C. § 2000a-3(a) (allowing a person alleging a violation of § 2000a to initiate "a civil action for preventative relief, including an application for permanent or temporary injunction, [or a] restraining order[.]").

Defendant argues that Plaintiffs are barred from seeking relief under § 2000a(a) because Plaintiffs sought only money damages in their Complaint.   Defendant further argues that if Plaintiffs can overcome their failure to request injunctive relief, Plaintiffs are still barred from seeking relief under § 2000a(a) because they failed to establish standing to seek injunctive relief in their Complaint.

In a one sentence statement in the introduction of their Response, Plaintiffs state that they are seeking injunctive relief as well as equitable relief.  (ECF No. 31, at 1).  Plaintiffs do not specify what type of injunctive relief they seek.  Nor do Plaintiffs establish that they have standing to seek injunctive relief.   Plaintiffs' only engagement with Defendant's § 2000a argument is their conclusory statement that they made hotel accommodations and were denied the benefit of their contract for stay when Mr. Patel used racial slurs and kicked them out.  (ECF No. 31, at 18).

The Court assumes that Plaintiffs have abandoned and waived any argument as to their § 2000a(a) claim because they did not respond to Defendant's summary judgment arguments on that issue.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. Of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Watson v. Southwest Arkansas Electrical Cooperative Corp.*, No. 4:18-cv-4158, 2020 WL 33223, at *5 (W.D. Ark. Jan. 2, 2020) (finding that a party's failure to address a summary judgment argument on a claim is a waiver of that claim).

Even if the Court were to find that Plaintiffs responded to Defendant's § 2000a argument, Plaintiffs' § 2000a claim nonetheless fails because Plaintiffs have not established the requisite standing to seek injunctive relief. To establish standing, Plaintiffs must show that (1) they have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of Defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy the first element, Plaintiffs must show that they suffered an injury in fact that is concrete, particularized, and actual or imminent. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (citing *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 929 (8th Cir. 2016)). Further, the injury in fact element of standing for injunctive relief "requires a showing that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Service of U.S.*, 205, F.3d 1034, 1037 (8th Cir. 2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-05 (1983)). If the unlawful conduct is not ongoing, then Plaintiffs must demonstrate "a real, [and] immediate threat that [they] would again suffer similar injury in the future." *Id.* (internal quotations omitted).

The Court finds that Plaintiffs have not demonstrated a threat of ongoing or future harm in either their Complaint or Response. Plaintiffs do not allege that they plan to return to the Days Inn or that they are likely to be discriminated against or refused service if they did return. *See Davis v. Walmart, Inc.*, No. 1:23-cv-1488, 2024 WL 3071644, at *6 (N.D. Ohio June 20, 2024) (finding the argument that the plaintiff runs a high risk of discrimination every time she enters a Walmart store too speculative to establish standing to assert a claim of injunctive relief). Accordingly, Plaintiffs' § 2000a Claim must be dismissed.

## C. Tort of Outrage Claim

Plaintiffs' final claim is for the tort of outrage under Arkansas law. (ECF No. 2). Specifically, Plaintiffs claim that Defendant knew or should have known that calling the police on

Plaintiffs would cause them emotional distress of such an extreme nature that no reasonable person should be expected to endure. (ECF No. 2, at 5-6).

To establish a tort of outrage claim, a plaintiff must demonstrate that: "(1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community;' (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it." *Crockett v. Essex*, 341 Ark. 558, 563-64, 19 S.W.3d 585, 589 (2000) (citing *Angle v. Alexander*, 328 Ark. 713, 721 945 S.W.2d 933, 936 (1997)).  The Supreme Court of Arkansas holds "a narrow view to the tort of outrage" and requires "clear-cut proof to establish the elements in outrage cases." *Id.* The tort of outrage "does not open the doors of the courts to every slight insult or indignity one must endure in life," *id.* (quoting *Travelers Ins. Co. v. Smith*, 338 Ark. 81, 89, 991 S.W.2d 591, 595 (1999)), rather, the emotional distress must be "so severe that no reasonable person could be expected to endure it." *Kiersey v. Jeffrey*, 369 Ark. 220, 223, 253 S.W.3d 438, 442 (2007) (quoting *M.B.M. Co., Inc. v. Counce*, 268 Ark. 269, 280, 596 S.W.2d 681, 687 (1980)).

Defendant argues that Plaintiffs fail to establish a claim of outrage because (1) Defendant did not intend to inflict emotional distress on Plaintiffs or knew or should have known that emotional distress was a likely result of its conduct; (2) Defendant did not engage in "extreme and outrageous" conduct; (3) Plaintiffs' distress was not caused by Defendant's conduct; and (4) Plaintiffs did not suffer "severe" emotional distress. (ECF No. 25, at 16-21).  Plaintiffs failed to respond to Defendant's argument.

As above, the Court assumes that Plaintiffs have abandoned and waived any argument as

16

to their claim of outrage because they did not respond to Defendant's arguments on that issue. Accordingly, the Court finds that Plaintiffs have failed to demonstrate a genuine issue of material fact as to any element of their claim of outrage, and this claim fails as a matter of law. However, even if the Court were to find that Plaintiffs responded to Defendant's arguments, Defendant is still entitled to summary judgment on Plaintiffs' claim of outrage.

Plaintiffs have not shown that issues of material fact exist as to the elements of their claim of outrage. Plaintiffs have not established that Defendant intended to cause emotional distress or knew or should have known that its conduct would cause emotional distress to Plaintiffs. Plaintiffs allege that Mr. Patel should have known that calling the police on African Americans in "an area like Fordyce, Arkansas" has "a high propensity of leading to a bad outcome[.]" (ECF No. 2, at 6). In support, Plaintiffs cite two articles that report that African American men face a greater risk of being killed in police encounters than men of other races. (ECF No. 2, at 6). However, Plaintiffs never demonstrate, or even alleged, that Mr. Patel read these articles or knew of these statistics.

Plaintiffs also failed to establish that Defendant's conduct was "extreme and outrageous" to be "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." *Crockett*, 341 Ark. at 563, 19 S.W.3d at 589. Plaintiffs only allege that Defendant's behavior was outrageous, however, "[m]erely describing the conduct as outrageous does not make it so." *Id.* The Arkansas Supreme Court has set a high bar for what conduct is considered extreme and outrageous. "Violent rhetoric, false accusations, and even physical violence has not been enough to make an outrage claim." *Parham v. Habilitation Center, LLC*, No. 1:15-cv-1048, 2016 WL 10646324, at *3 (W.D. Ark. Apr. 29, 2016) (citing *Faulkner v. Ark. Children's Hospital*, 347 Ark. 941, 958, 69 S.W.3d 393, 404 (2002)). Viewing the facts most favorable to Plaintiffs, the Court finds that Defendant's conduct does not reach the high threshold set by Arkansas courts. The Court

17

declines to find that calling the police during a heated altercation, especially when nothing outrageous happened from the police encounter, amounts to a tort of outrage. Further, even assuming Mr. Patel did call Mr. Johnson a drunk and a racial slur, the Arkansas Supreme Court has held that profane language and threats are not enough to sustain a claim of outrage. *See Holloman v. Keadle*, 326 Ark. 168, 175, 931 S.W.2d 412, 417 (1996) (finding that an employer's repeated curses, racial slurs, degrading remarks and threats of violence were not sufficient to state a claim for the tort of outrage). Accordingly, Defendant is entitled to summary judgment on Plaintiffs' tort of outrage claim.

## IV.    CONCLUSION

For the reasons stated above, the Court finds that Defendant's Motion for Summary Judgment (ECF No. 24) should be and hereby is **GRANTED**. Plaintiffs' claims are **DISMISSED WITH PREJUDICE**. A judgment of even date shall issue.

**IT IS SO ORDERED**, this 27th day of October, 2025.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge